380 So.2d 14 (1980)
STATE of Louisiana
v.
Charles James MENNE, Jr.
No. 65130.
Supreme Court of Louisiana.
January 28, 1980.
Rehearing Denied March 3, 1980.
Order Filed March 14, 1980.
*15 Nolan J. Edwards, Edwards, Stefanski & Barousse, Crowley, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., G. Thomas Porteous, Jr., Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
DENNIS, Justice.[*]
In our review of this criminal conviction we are called upon to decide whether a person who responds to a policeman's request that he come to the stationhouse for questioning must be advised of his constitutional rights when circumstances arise which create ambiguity as to whether he is any longer at liberty. We hold that under the Fifth Amendment and the Louisiana Constitution, an officer must give constitutional warnings to a person under investigation whenever the circumstances reasonably indicate that the interogee has been deprived of his freedom in any significant way.
Accordingly, under the circumstances of this casein which the defendant came to the police station for questioning at an officer's request, was not informed that there was no legal obligation that he comply, was subjected to questioning by two officers in a police interrogation room for approximately one hour, and was told by the officers that they thought he knew more than he had told about the murder they were investigating because he was the last person to possess the murder weapon before it was found in the victim's carthe defendant was detained or deprived of his freedom in a significant way, requiring that the officers advise him fully of his rights before continuing interrogation. Consequently, the confessions obtained from defendant without affording him this safeguard should have been suppressed. The judgment of the trial court denying defendant's motion to suppress and the guilty plea conviction induced by the erroneous ruling must be reversed.
Defendant, Charles James Menne, Jr., moved to suppress the use of his confession as evidence in his first degree murder prosecution. After a hearing the trial court refused to suppress the confession and Menne pleaded guilty to second degree murder, reserving his right to appeal the unfavorable suppression ruling. See State v. Crosby, 338 So.2d 584 (La.1976). Menne was sentenced to life imprisonment at hard labor, without parole, probation or suspension of sentence. He appealed, assigning as error the denial of his motion to suppress.
Charles James Menne, Jr. denied any complicity in the murder of his acquaintance, Wesley Morgan, when he was first questioned by police. Two months later he *16 became an object of sharpened interest to officers investigating the murder when they learned that Menne had at one time owned the murder weapon, a handgun found in the victim's car. An officer telephoned Menne and asked him to come to the police station for questioning about the weapon. Menne agreed and was brought to the stationhouse by a police squad car. At the station he was taken directly to an interrogation room on the second floor where he met Lieutenant Thibodeaux and Lieutenant Pelot. These investigating officers testified that Menne was not advised of his constitutional rights before the interrogation began. The record also indicates that Menne was never informed that he was not under arrest or that he was not obliged to remain at the stationhouse or submit to questioning.
The evidence is sketchy as to the first part of the interrogation. Lieutenant Pelot asked Menne from whom he had obtained the weapon, what he had done with it, and when he had last seen the victim. The evidence before us does not reveal Menne's specific answers, but he evidently admitted that he once owned or possessed the weapon because the officers testified that he claimed to have sold it to the murder victim. Wesley Morgan. After Menne had been under interrogation for about one hour, Lieutenant Thibodeaux told Menne that they did not believe he was being truthful with them because their investigation indicated he was the last person with the weapon before Wesley Morgan's death and therefore must know more about the murder than he had divulged. At that time Menne said "You got me, I killed him." Lieutenant Thibodeaux testified that he thought Menne was joking and replied, "Well, tell me something about the murder." In response, Menne told them how he had wrecked Wesley Morgan's car after the murder by running into a railroad crossing pole. Since this information was not contained in any of the news reports concerning the case, Lieutenant Thibodeaux concluded that Menne definitely was the murderer. At this point, Menne was for the first time advised of his constitutional rights. Afterwards, the officers took his fully detailed confession and reduced it to writing.
Menne argues that the trial court's ruling must be reversed and his confessions suppressed because they were obtained through police interrogation without prior advice of his right to counsel and his right to remain silent in violation of the Fifth and Sixth Amendments, as expounded in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as well as Article 1, § 13 of the 1974 Louisiana Constitution. The prosecution contends, on the other hand, that the officers were under no obligation to give Menne the warnings sooner than they did because, as was made clear in Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), Menne was not in custody during the early stages of his interrogation. The issue, therefore, is whether under the circumstances of this case, the police officers failed to timely perform their duty of advising the defendant of his constitutional rights.
In explication of the basic rights to the assistance of counsel and the freedom from self-incrimination, the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. By "custodial interrogation," the Miranda court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. See Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). Thus, it is clear that the constitutional warnings are required in "situations falling short of a *17 formal placing in arrest ... in which the accused may be said to be under custody or significant restraint." State v. Roach, 322 So.2d 222, 227 (La.1975).
No less is required by Article I, § 13 of the 1974 Louisiana Constitution. By providing that a person "arrested or detained in connection with the investigation" of an offense must be fully advised of his rights, the framers intended to require that investigating officers give the warnings anytime such a citizen was deprived of his liberty in a significant way or was not free to go as he pleased. State in the Interest of Dino, 359 So.2d 586 (La.1978); State v. Segers, 355 So.2d 238 (La.1978); State v. Welch, 337 So.2d 1114 (La.1976); State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, September 7, 1973, Vol. XIV, pp. 45-48; Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 40-48 (1974).
Whether a person has been taken into custody, detained or deprived of his freedom of action in a significant way must be decided by an objective test. Any formulation making the need for Miranda warnings depend upon how each individual being questioned perceived his situation would require a prescience neither the police nor any one else possesses. On the other hand, a standard hinging on the inner intentions of the police would fail to recognize Miranda's concern with the coercive effect of the "atmosphere" from the point of view of the person being questioned. United States v. Hall, 421 F.2d 540 (2d Cir. 1969); State v. Roach, 322 So.2d 222 (La. 1975); State v. Corey, 339 So.2d 804 (La. 1976).
Viewing the evidence objectively, from the standpoint of a reasonable interogee, we conclude that Menne was deprived of his freedom of action in a significant way at least from the time the two officers informed him, following an hour's interrogation, that he was the last person with the murder weapon before the victim's death and that they believed he knew more about the crime than he had revealed. By this time Menne, who knew that all other previous owners of the gun had been eliminated as suspects, would have been rash indeed to suppose that he was free to leave the second floor interrogation room if he pleased. Indeed, so far as the record discloses, Menne was never informed that he was not under arrest. A request to appear at a police station may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen. See ALI, A Model Code of Pre-Arraignment Procedures, § 110.1(5) Commentary; see also § 120.5. The circumstances in this case dictate a finding that even without any physical restraint or express declaration that he was under arrest Menne necessarily and reasonably must have understood that he was under compulsion to remain and submit to questioning. Cf. State v. Sherer, 354 So.2d 1038 (La. 1978); see Seals v. United States, 117 U.S. App.D.C. 79, 325 F.2d 1006 (D.C.Cir. 1963); People v. White, 69 Cal.2d 751, 72 Cal.Rptr. 873, 446 P.2d 993 (1968); People v. Arnold, 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967). The practical significance of the safeguards provided for custodial or detentional interrogations would be greatly undermined if it were to open to the police to contend that none of those safeguards applied since the accused had appeared and remained at the police station voluntarily, although the accused reasonably may have thought that he was under constraint. See ALI, A Model Code of Pre-Arraignment Procedures Commentary, § 120.5.
The prosecution's arguments reduce the problem to a false simplicity by ignoring complicating factors.
First, the state's brief describes the case as one in which events had not focused any suspicion on Menne or given him any reason to suppose that he was under constraint before he "blurted out" a confession. This argument is, of course, based upon a clearly erroneous view of the evidence.
Next, the state declares defendant's assignment of error to be without merit, citing Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), without *18 further explanation, as if the case were on all fours with the present one. Mathiason represents, however, a determination by the Supreme Court that under the particular facts there, which are distinguishable from those in the present case, a person questioned by a police officer had not been taken into custody or otherwise deprived of his freedom in any significant way. The high court took its facts from the Oregon Supreme Court opinion as follows:
"`An officer of the State Police investigated a theft at a residence near Pendleton. He asked the lady of the house which had been burglarized if she suspected anyone. She replied that the defendant was the only one she could think of. The defendant was a parolee and a "close associate" of her son. The officer tried to contact defendant on three or four occasions with no success. Finally, about 25 days after the burglary, the officer left his card at defendant's apartment with a note asking him to call because "I'd like to discuss something with you." The next afternoon the defendant did call. The officer asked where it would be convenient to meet. The defendant had no preference; so the officer asked if the defendant could meet him at the state patrol office in about an hour and a half, about 5:00 p. m. The patrol office was about two blocks from defendant's apartment. The building housed several state agencies.
"`The officer met defendant in the hallway, shook hands and took him into an office. The defendant was told he was not under arrest. The door was closed. The two sat across a desk. The police radio in another room could be heard. The officer told defendant he wanted to talk to him about a burglary and that his truthfulness would possibly be considered by the district attorney or judge. The officer further advised that the police believed defendant was involved in the burglary and [falsely stated that] defendant's fingerprints were found at the scene. The defendant sat for a few minutes and then said he had taken the property. This occurred within five minutes after defendant had come to the office. The officer then advised defendant of his Miranda rights and took a taped confession.
"`At the end of the taped conversation the officer told defendant he was not arresting him at this time; he was released to go about his job and return to his family. The officer said he was referring the case to the district attorney for him to determine whether criminal charges would be brought. It was 5:30 p. m. when the defendant left the office.
"`The officer gave all the testimony relevant to this issue. The defendant did not take the stand either at the hearing on the motion to suppress or at the trial.'" [emphasis added] 429 U.S. at 493-94, 97 S.Ct. at 713, 50 L.Ed.2d at 718.
From the moment Mathiason entered the policeman's office his case differed markedly from the one at bar. He was confronted by a lone officer in an office, rather than two policemen in a second floor interrogation room. He "was immediately informed that he was not under arrest," 429 U.S. at 495, 97 S.Ct. at 714, instead of being kept uninformed of his status during extensive interrogation. He confessed "within five minutes after [he] had come into the office," rather than after an hour's interrogation by two policemen. 429 U.S. at 493, 97 S.Ct. at 713. At the close of a one-half hour interview Mathiason left the office without hindrance, as opposed to being arrested and incarcerated immediately following his interrogation. 429 U.S. at 495, 97 S.Ct. at 714. The Supreme Court concluded that it was "clear from these facts that Mathiason was not in custody `or otherwise deprived of his freedom of action in any significant way.'" 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719. It is equally clear from the facts in the present case that Menne, who was not informed that he was under no compulsion to appear or to remain at the police station, was led to believe, as a reasonable person, that he was not at liberty at least from the time the officers informed him they did not believe his story because he had been the last person with *19 the murder weapon before it was found in the victim's car.
Furthermore, as we made clear in State in the Interest of Dino, supra, 359 So.2d 586 at 590, even if Mathiason were on all fours with the present case, "its holding clearly does not govern our interpretation of Article 1, § 13 of the 1974 Louisiana Constitution whose framers intended to adopt the Miranda edicts full-blown and unfettered." As we further stated in Dino:
"* * * [I]t appears that, in fact, there was an intention by the convention to go beyond Miranda and to require more of the State regarding the precise issue now under discussion. In Article I, § 13 the cautions are triggered and must be given `when any person has been arrested or detained in connection with the investigation or commission of any offense.' The use of `detained' in addition to `arrested' was intended to prevent a narrow construction of the latter term." 359 So.2d at 592.
We conclude that Menne clearly was detained or had his freedom deprived in a significant way at least from the time the officers questioned his credibility and indicated he was a primary suspect. Under these circumstances, the warnings were required and the prosecution should not have been permitted to use the statements obtained from defendant without procedural safeguards effective to secure his privilege against self-incrimination.
For the reasons assigned, the defendant's conviction and sentence are set aside, the defendant's motion to suppress his confessions is granted, and the case is remanded for further proceedings.
REVERSED AND REMANDED.
SUMMERS, C. J., dissents.
MARCUS and BLANCHE, JJ., dissent and assign reasons.
MARCUS, Justice (dissenting).
In Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the United States Supreme Court stated that
police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him `in custody.' It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.
I do not consider that there had been such a restriction on defendant's freedom in this case as to render him "in custody." Accordingly, I respectfully dissent.
BLANCHE, Justice (dissenting).
Persons not under an in-custody investigation are not entitled to a Miranda warning. Neither are persons who volunteer statements at a time when a criminal investigation has not focused on them. This opinion would require police to give Miranda warnings to everyone whom they merely question.

ORDER
Further proceedings in this case are stayed for 90 days or until application for review is filed with the United States Supreme Court, whichever is sooner.
NOTES
[*] The Honorable Jesse N. Stone, Jr. participated in this decision as an Associate Justice Ad Hoc.